**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Kent A Murar, | No. CV-19-05793-PHX-MTL |
| Plaintiff, | **ORDER** |
| v. | |
| AutoNation Incorporated, et al., | |
| Defendants. | |

Before the Court are Defendants AutoNation Inc.'s ("AutoNation") and AN Motors of Scottsdale, LLC's ("AFS") (collectively "Defendants") Motion for Summary Judgment (Doc. 58). The Court rules as follows.

**I.    BACKGROUND**

AutoNation, through its wholly owned subsidiaries, is the largest automotive retailer in the United States. (Doc. 58–2 at 3.) AFS is one of those subsidiaries, located in Scottsdale, Arizona. (*Id.* at 28.)

In early 2018, Plaintiff Kent Murar was working as the general manager of an AutoNation dealership in Austin, Texas. (Docs. 58–2 at 33–34; 61 at 2.) Murar inquired about transferring from Austin to Phoenix. (Docs. 58–2 at 131; 61 at 2.) He met with Matthew Brown to discuss opportunities available in the Phoenix area. (Doc. 61 at 2.) Brown is the Arizona market president of AutoNation Western Region ("AWR"), which is another subsidiary of AutoNation. (Doc. 58–2 at 126–127.) Brown told Murar about several dealerships he could potentially run in the Phoenix area, including AFS. (Doc. 61–

2 at 5.) Brown informed Murar that AFS's sales were underperforming but suggested that if Murar could turn it around, AFS would be a good opportunity for him to match the income he was making in Austin. (Docs. 58–2 at 133; 61 at 2.) Shortly thereafter, Murar interviewed with Brown and Steve Kwak, the president of AWR. (Doc. 61 at 2–3.)

Murar began working as the general manager of AFS on February 3, 2018. (Docs. 58 at 3; 61 at 3.) From February to May 2018, AFS's performance was doing well. (Docs. 58 at 3; 58–2 at 118.) But the dealership's performance began to decline sometime in June 2018. (Docs. 58 at 3; 58–2 at 119–121.) Brown and Murar discussed the dealership's declining performance that same month. (Doc. 58–2 at 119–120.) AFS's performance continued to struggle through September 2018. (Docs. 58 at 3; 58–2 at 121; 61 at 6.)

On September 3, 2018, Murar sent Brown an email with a "comprehensive list of issues" he had learned of at AFS. (Doc. 58–4 at 2; 61 at 5.) Among other things, Murar complained that some employees were engaging in "fraudulent deals and forging signatures." (Doc. 58–4 at 2.) He complained about one employee writing fake and "fraudulent" repair orders, whereby customers would pay for parts and repairs that were not installed or performed. (*Id.* at 3.) Murar also complained of other business practices, which he believed violated "compliance rules" and were "ethically and morally wrong." (*Id.* at 2, 4.) Murar told Brown that if the compliance issues were not addressed, he wanted a release, severance package, non-disclosure agreement, and for Defendants to cancel his non-compete agreement. (*Id.* at 5.)

The same day, Brown sent Murar a response email. (*Id.* at 7.) Brown acknowledged that several compliance issues had been discovered since Murar started working at AFS. (*Id.*) Brown stated that he had instructed his market team to support Murar in putting proper processes and safeguards in place to address the compliance issues. (*Id.*) But Brown explained that even with these efforts, AFS's performance continued to struggle. (*Id.*)

On September 9, 2018, Murar forwarded Brown an email from a customer who complained of misleading sales tactics by an employee in the finance department. (Doc. 61–6 at 12–13.) The customer specifically complained of paying for products and services

he had not signed up for. (*Id.*) Murar told Brown this was one of the issues he had referred to in his September 3, 2018 email. (*Id.*) Similarly, on September 19, 2018, Murar forwarded Brown an email from a customer who complained that an employee had forged her signature on a contract to change the name of the bank who financed her loan. (*Id.* at 18–19.)

On September 20, 2018, Murar met with Brown and Kwak to discuss the issues Murar had detailed in his September 3, 2018 email. (Docs. 58 at 7; 61 at 5.) Murar told Brown and Kwak that they had lied to him about the issues at AFS. (Doc. 61–2 at 22–23.) During the meeting, Kawk picked up the phone and requested the audit team to conduct an audit of AFS. (Docs. 58 at 7; 61–2 at 22.)

A week later, on September 27, 2018, Brown and Murar met to discuss the dealership's performance. (Docs. 58 at 3; 61 at 6.) Brown sent Murar an email the following day. (Doc. 58–4 at 22.) In the email, Brown stated that they needed to take immediate steps to improve AFS's performance. (*Id.*) Brown further explained that the fourth quarter of 2018 was critical for Murar to remain at AFS. (*Id.*) The email laid out 12 performance targets. (*Id.*) Brown explained that Murar needed to meet a majority of these targets on a monthly basis to retain his position. (*Id.*) Murar testified that he believed these targets were achievable (Doc. 58–2 at 116–118.)

On September 28, 2018, AFS's controller sent Brown and Murar an email raising concerns about the purchase of a vehicle by Brown's brother. (Doc. 58–4 at 20.) Murar discovered that a trade-in vehicle contemplated by the purchase agreement was never delivered to AFS. (Doc. 58 at 6; 61 at 7.) Murar believed this was an attempt to avoid paying sales tax on the purchased vehicle by offsetting the purchase price with the value of the trade-in that never arrived at the dealership. (Doc. 58–2 at 40–41.) After receiving the controller's email, Murar called Brown and told him "there was an issue with the deal" and suggested that he look into it because it involved his family. (*Id.* at 46.) Murar also asked Brown if there was anything he could do to help. (*Id.* at 48.) Brown responded that he would take care of it. (*Id.* at 48–49.)

Later, on October 24, 2018, Murar informed Brown that an employee had created a false bill of lading to help a customer avoid paying applicable sales taxes. (Doc. 58 at 7.) A bill of lading is a document evidencing that a purchased vehicle will be shipped out of state and, thus, used to legally waive the tax that would otherwise be paid on the purchase. (Doc. 58–2 at 52.) Murar testified that he saw a customer drive off in a purchased vehicle. (*Id.* at 53.) He later discovered, however, that an employee had waived the customer's sales taxes with a bill of lading. (*Id.* at 53.) When Murar confronted the employee, the employee confessed that he waived the taxes with a false bill of lading. (*Id.* at 56.)

While these events were taking place, the dealership's performance continued to decline. (Docs. 58 at 4; 58–4 at 25.) Instead of improving, AFS's performance in October was worse under seven of the 12 targets than it had been in September. (Doc. 58–4 at 25.) Brown terminated Murar on October 25, 2018. (*Id.* at 36.) AFS ultimately failed to meet 11 of the 12 targets for October 2018. (*Id.* at 25.)

Murar initiated this lawsuit against Defendants on October 9, 2019, alleging wrongful termination under the Arizona Employment Protection Act ("AEPA"). (Doc. 1–2 at 2–13.) He also claimed Defendants breached the implied covenant of good faith and fair dealing by failing to inform him of compliance issues prior to making him an offer, failing to address his reports of unlawful activity, and firing him in retaliation for refusing to engage in and reporting unlawful conduct. (*Id.* at 11–12.) Murar sued both AutoNation and AFS alleging that they act and operate as a single entity. (*Id.* at 3.)

## II.   LEGAL STANDARD

Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and material facts are those "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). At the summary judgment stage, "[t]he evidence of the non-movant

is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Id.* at 255; *see also Jesinger v. Nev. Fed. Credit Union*, 24 F.3d 1127, 1131 (9th Cir. 1994) ("The court must not weigh the evidence or determine the truth of the matters asserted but only determine whether there is a genuine issue for trial.").

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A party opposing summary judgment must "cit[e] to particular parts of materials in the record" establishing a genuine dispute or "show[] that the materials cited do not establish the absence of . . . a genuine dispute." Fed. R. Civ. P. 56(c)(1). This Court has no independent duty "to scour the record in search of a genuine issue of triable fact." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (internal quotations omitted).

### III.  DISCUSSION

#### A.  Breach of the Implied Duty of Good Faith and Fair Dealing

In Arizona, "[t]he employment relationship is contractual in nature." A.R.S. § 23-1501(A)(1). There is an implied covenant of good faith and fair dealing in employment contracts. *Wagenseller v. Scottsdale Mem'l Hosp.*, 147 Ariz. 370, 385 (1985), *superseded in part by* A.R.S. § 23–1501. Nevertheless, the AEPA "sets out the limited circumstances in which an employee can bring a wrongful termination action in Arizona." *Harper v. State*, 241 Ariz. 402, 404 (App. 2016). A wrongful termination claim based on the breach of an employment contract is generally only available if there is a written contract "setting forth . . . a specified duration of time or otherwise expressly restricting the right of either party to terminate the employment relationship." A.R.S. § 23-1501(A)(2); *see also Taylor v. Graham Cty. Chamber of Com.*, 201 Ariz. 184, 193 (App. 2001). Thus, the implied covenant of good faith and fair dealing only applies in the employment context where there is a written contract evidencing that the employment is not at-will. *See* A.R.S. § 23-1501(A)(2); *see also Thorp v. Home Health Agency-Arizona, Inc.*, 941 F. Supp. 2d 1138,

1143 (D. Ariz. 2013) (dismissing claim for breach of the covenant of good faith and fair dealing where there was no written employment contract).

Murar does not allege that there was a written employment contract stating that his employment was for a specified duration of time or otherwise restricting the right of either party to terminate his employment. To the contrary, both the Compensation Plan and Associate handbook Murar received when he was hired expressly state that his employment was at-will. (Docs. 58–2 at 157; 61–4 at 10.) Murar's claim is, therefore, precluded by the express language of the AEPA.[1]

The outcome would be the same even if such a claim were not statutorily precluded. The covenant of good faith and fair dealing "requires that neither party do anything that will injure the right of the other to receive the benefits of their agreement." *Wagenseller*, 147 Ariz. at 383. "Therefore, it protects an employee only to the extent that the employer denied the terminated employee benefits agreed to in the employment contract." *White v. AKDHC, LLC*, 664 F. Supp. 2d 1054, 1065 (D. Ariz. 2009). "In the case of an employment-at-will contract, it may be said that the parties have agreed, for example, that the employee will do the work required by the employer and that the employer will provide the necessary working conditions and pay the employee for work done." *Wagenseller*, 147 Ariz. at 385.

At the outset, Murar does not expressly identify a contract from which any potential benefits can be determined. The only document referenced in his Complaint is the AutoNation Associate Handbook. (Doc. 1–2 ¶¶ 19–21.) Murar first alleges that the Defendants breached their duty of good faith and fair dealing by not informing him of the compliance issues at AFS prior to making him an offer. (*Id.* ¶ 58.) As Defendants correctly

---

[1] It is true that the AEPA does not "preclude wrongfully terminated employees from pursuing collateral common law tort claims related to discharge from employment, including intentional infliction of emotional distress, negligent infliction of emotional distress, interference with contractual relations, or defamation." *Cronin v. Sheldon*, 195 Ariz. 531, 541 (1999) (internal citations omitted). It is also true that "[i]n certain circumstances, breach of contract, including breach of the covenant of good faith and fair dealing, may provide the basis for a tort claim." *Wagenseller*, 147 Ariz. at 383 (1985). But in the employment context, a claim for breach of the implied covenant of good faith and fair dealing is contractual in nature. *Id.*; *see also Nelson v. Phoenix Resort Corp.*, 181 Ariz. 188, 198 (App. 1994). Accordingly, Murar's claim is governed by the AEPA, not common law relating to torts.

point out, however, at the time they offered Murar the position, there was no employment contract or relationship between the parties. (Doc. 58 at 10.) In other words, there was no implied covenant for Defendants to breach at such time. Moreover, even if such employment relationship had existed at the time, Murar has not offered any evidence that being informed of compliance issues was a benefit of his employment contract.

Murar also contends that Defendants failed to address his reports of unlawful activity. (Doc. 1–2 ¶ 58.) The Associate Handbook required Murar to promptly report known or suspected violations of law. (Doc. 61–4 at 11–12.) The Associate Handbook did not require Defendants to address those reports and, even assuming it did, such requirement would benefit Defendants, not Murar.

Finally, Murar argues Defendants breached the covenant of good faith and fair dealing by firing him in retaliation for reporting and refusing to engage in unlawful conduct. (Doc. 1–2 ¶ 58.) "In the context of a pure at-will employment contract with no agreed-to benefits and no promise of continued employment or tenure, a termination without cause does not breach the implied covenant of good faith and fair dealing." *White*, 664 F. Supp. 2d at 1065; *see also Wagenseller*, 147 Ariz. at 385 ("What cannot be said is that one of the agreed benefits to the at-will employee is a guarantee of continued employment or tenure."). Thus, Murar's termination, by itself, did not breach the covenant. To the extent Murar is claiming retaliation for reporting and refusing to engage in unlawful conduct, he would have to bring a claim under the relevant provisions of the AEPA, not a common law claim for the breach of the implied covenant of good faith and fair dealing. *See* A.R.S. § 23-1501(A)(3)(c) (providing an employee has a claim against his employer if terminated for refusing to commit an act that would violate Arizona law or for properly disclosing violations of Arizona law). The Court, therefore, finds that there is no genuine issue of material fact and Defendants are entitled to summary judgment as to Murar's claim for breach of the implied covenant of good faith and fair dealing.

### B. Arizona Employment Protection Act

The burden-shifting analysis established by the United States Supreme Court in

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies to AEPA retaliation claims at the summary judgment stage. *Whitmire v. Wal-Mart Stores Inc.*, 359 F. Supp. 3d 761, 800 n.29 (D. Ariz. 2019) (citing *Czarny v. Hyatt Residential Mktg. Corp.*, No. 1 CA-CV 16-0577, 2018 WL 1190051, at *2 (Ariz. Ct. App. Mar. 8, 2018) (mem. decision)); *see also Baron v. HonorHealth*, No. 1 CA-CV 19-0391, 2020 WL 5638539, at *2 (Ariz. Ct. App. Sept. 22, 2020) (mem. decision).[2] Under this framework, an employee has the initial burden of establishing a prima facie case of retaliation. *Baron*, 2020 WL 5638539, at *2. If the employee establishes a prima facie case, the burden shifts to the employer to articulate a legitimate nonretaliatory reason for termination. *Id.* If the employer articulates such a reason, the plaintiff has the burden of showing the employer's alleged reason is pretextual. *Id.*

### 1. Prima Facie Case

To establish a prima facie case of retaliation under the AEPA, an employee must show: (1) the employee engaged in a protected activity; (2) the employee was terminated; and (3) that there is a causal link between the protected activity and the termination. *Whitmire*, 359 F. Supp. 3d at 796.

#### a. Protected Activity

Whether the employee engaged in protected activity depends on the relevant provision of the AEPA under which an employee is bringing a claim. *See Whitmire*, 359 F. Supp. 3d at 797; *Baron*, 2020 WL 5638539, at *2. Murar first alleges that Defendants terminated him in retaliation for refusing to engage in or endorse activities that would violate Arizona law. (Doc. 1–2 at 11.) It is unlawful for an employer to terminate an employee in retaliation for refusing "to commit an act or omission that would violate the Constitution of Arizona or the statutes of this state." A.R.S. § 23-1501(A)(3)(c)(i). Defendants argue they did not ask Murar to violate Arizona law. (Doc. 58 at 15–16.)

---

[2] The Court recognizes that *Czarny* and *Baron* are unpublished memorandum decisions and are, thus, not precedential. Ariz. Sup. Ct. R. 111(c). However, these memorandum decisions may be cited for persuasive value, as they are here, because they were "issued on or after January 1, 2015; no opinion adequately addresses the issue before the court; and the citation is not to a depublished opinion or a depublished portion of an opinion." *Id.*

- 8 -

Indeed, Murar did not identify an act or omission that Defendants asked him to do that would have violated Arizona law. Although Murar alleges that as the general manager, he felt personally responsible for the dealerships customers and did not want to perpetuate the fraudulent schemes taking place (Doc. 1–2 at 9), he did not allege or present any evidence that Defendants asked him to commit fraud himself. Because Murar could not have refused to do something he was never asked to do, he did not engage in protected activity for purposes of A.R.S. § 23-1501(A)(3)(c)(i).

Murar also alleged Defendants terminated him in retaliation for reporting activities that he reasonably believed violated Arizona law. (*Id.* at 11.) It is unlawful for an employer to terminate an employee in retaliation for

> The disclosure by the employee in a reasonable manner that the employee has information or a reasonable belief that the employer, or an employee of the employer, has violated, is violating or will violate the Constitution of Arizona or the statutes of this state to either the employer or a representative of the employer who the employee reasonably believes is in a managerial or supervisory position and has the authority to investigate the information provided by the employee and to take action to prevent further violations . . . .

A.R.S. § 23-1501(A)(3)(c)(ii). "Under the [A]EPA, it is not necessary that an actual violation of a statute occur." *Harper*, 241 Ariz. at 404. Murar asserts he reported violations of Arizona law, including tax evasion (A.R.S. §§ 42-1125, 42-5061, and 42-1127), forgery (A.R.S. § 13-2002), consumer fraud (A.R.S. § 44-1521), and criminal fraud (A.R.S. § 13-2310).[3] The Court will assess these statutes in turn.

---

[3] An employee bringing a claim under the whistleblower provision of the AEPA must identify the Arizona statutes that the employer violated in the complaint. *Painter v. Katerra Inc.*, No. CV-21-00308-PHX-SRB, 2021 WL 2589736, at *4 (D. Ariz. Apr. 5, 2021) ("Indeed, it would be impossible for even an inference to be made that Plaintiff's belief was 'reasonable' unless the particular statute or constitutional provision is identified by Plaintiff in his pleading."); *See also Drottz v. Park Electrochemical Corp.*, No. CV 11-1596-PHX-JAT, 2013 WL 6157858, at *16 (D. Ariz. Nov. 25, 2013) ("By the plain terms of the AEPA, a plaintiff must point to a predicate Arizona constitutional provision or statute."). Because Murar only identified the Arizona statutes relating to tax evasion, forgery, consumer fraud, and criminal fraud, these are the only alleged violations the Court will consider.

### i.     Tax Evasion

Murar contends he disclosed potential violations of Arizona tax law to Brown. (Doc. 61 at 12.) Sales taxes are imposed on persons engaged in a taxable business in Arizona. A.R.S. § 42-5008; Ariz. Admin. Code R15-5-2002(A). A vendor may pass the economic burden of the sales tax on to the customer. Ariz. Admin. Code R15-5-2210(A). The vendor must remit all sales taxes collected to the Arizona Department of Revenue and other applicable taxing jurisdictions. Ariz. Admin. Code R15-5-2210(B). But "[t]he vendor shall be liable for the tax, regardless of whether or not the vendor passes on the economic burden of the tax to the customer." Ariz. Admin. Code R15-5-2002(A). A person who fails to truthfully account for and pay sales taxes or willfully attempts in any manner to evade or defeat the taxes or their payment is liable for the amount not collected or accounted for. A.R.S. § 42-1125(N). Moreover, there are criminal penalties for knowingly making a false or fraudulent statement or representation or using a false writing or document knowing it to contain false statements with intent that the Department rely on it in determining tax liability. A.R.S. § 42-1127(B)(4).

Here, Murar learned of an issue related to a vehicle purchase by Brown's brother, whereby a trade-in vehicle contemplated by the purchase agreement was never delivered to AFS. (Doc. 61 at 7.) Murar believed this deal was an attempt to avoid paying sales tax on the purchased vehicle by offsetting the purchase price with the value of the trade-in that never arrived. (Doc. 58–2 at 40–41.) Another employee initially sent an email to both Murar and Brown raising concerns over the deal. (Doc. 58–4 at 20.) Following this email, Murar called Brown and told him "there was an issue with the deal" and suggested that he look into it because it involved his family. (Doc. 58–2 at 46.) Murar also asked Brown if there was anything he could do to help. (*Id.* at 48.) Although an employee is not required to specify which Arizona statute is being violated at the time of the disclosure, he must actually disclose belief of a violation. *Secord v. Marketo Inc.*, No. CV-18-03142-PHX-GMS, 2020 WL 1033165, at *2 (D. Ariz. Mar. 3, 2020). It is not enough for an employee to report general concerns over the employer's actions. *See id.* Instead, an employee must

call out the action's illegality. *Id.* As Defendants point out, Murar did not raise concerns about the deal's illegality. (Doc. 58 at 15.) Indeed, Murar did not even specify that he believed there was a tax issue or further elaborate on what the perceived issue was. (*Id.* at 6.) Accordingly, Murar has not shown he engaged in protected activity by telling Brown there was an issue with the purchase involving his brother.

Murar also informed Brown that an employee had provided a falsified bill of lading to help a customer avoid paying applicable sales taxes. (*Id.* at 7.) Sales taxes do not apply to "[s]ales of motor vehicles to nonresidents of this state for use outside this state if the motor vehicle dealer ships or delivers the motor vehicle to a destination out of this state." A.R.S. § 42-5061(A)(14). A bill of lading is a document evidencing that a purchased vehicle will be shipped out of state and, thus, used to waive the tax that would otherwise be paid on the purchase. (Doc. 58–2 at 52.) Murar testified he saw a customer drive off in a purchased vehicle but later learned that an employee had waived the customer's taxes with a bill of lading. (*Id.* at 53.) When Murar confronted the employee, the employee confessed that he waived the taxes with a false bill of lading. (*Id.* at 56.) Murar reported this incident to Brown. (*Id.*) Viewing these facts in the light most favorable to Murar, a reasonably jury could find that he engaged in protected activity by reporting the alleged waiver of taxes with falsified bill of lading.

### ii.     Forgery

Murar next contends he disclosed instances of forgery that violate A.R.S. § 13-2002. (Doc. 61 at 12.) A person commits forgery if he falsely makes, completes, or alters a written instrument with intent to defraud. A.R.S. § 13-2002(A)(1). In the September 3, 2018 email to Brown, Murar explained he had discovered an employee had made "fake" and "fraudulent" repair orders, whereby customers would pay for repairs that were not performed. (Doc. 61–6 at 3.) In another email, Murar also informed Brown that a customer had complained that an employee forged her signature on a finance agreement. (*Id.* at 18–19.) Viewing these facts in the light most favorable to Murar, a reasonably jury could find that he engaged in protected activity by reporting the alleged fake repair orders and

allegedly forged signature.

### iii. Consumer Fraud

Murar contends he disclosed instances of consumer fraud that violate A.R.S. § 44-1522.[4] (Doc. 61 at 12.) The Arizona Consumer Fraud Act prohibits "misrepresentation . . . of any material fact with intent that others rely on such [misrepresentation] . . . in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby." A.R.S. § 44-1522(A). Merchandize includes "any objects, wares, goods, commodities, intangibles, real estate or services." A.R.S. § 44-1521(5). In his September 3, 2018 email to Brown, Murar discussed many business practices that, according to him, violated the company's "compliance rules." (Doc. 61–6 at 2–5.) He also stated that he believed these actions were "ethically and morally wrong." (*Id.* at 4.) The AEPA prohibits retaliation for disclosing violations of Arizona law not an employer's internal policies or actions that are simply unethical or immoral. A.R.S. § 23-1501(A)(3)(c)(ii). Thus, Murar did not engage in protected activity regarding these portions of his email.

But at least in one part of his September 3, 2018 email, Murar mentioned that an employee had made "fake" and "fraudulent" repair orders. (Doc. 61–6 at 3.) According to Murar, customers would pay for repairs but they would not be performed. (*Id.*) Defendants argue they already knew of the allegedly fake repair orders and, therefore, that Murar's email cannot be considered a disclosure. (Doc. 58 at 5–6; 14–15.) The fact that some of Defendant's employees already knew of the fake repair orders does not negate the fact that Murar reported these issues to Brown. Accordingly, viewing these facts in the light most favorable to Murar, a reasonably jury could find that he engaged in protected activity by reporting the alleged fake repair orders.

---

[4] Murar's response mistakenly cites to A.R.S. § 45-1521 *et seq*. Title 45 of the Arizona Revised Statutes relates to waters and § 1521 has been renumbered to A.R.S. § 48-2922, which relates to irrigation and water conservation districts. Additionally, Murar cited A.R.S. 44-1521 et seq. in his Complaint. (Doc. 1–2 at 11.) This Article is titled "Consumer Fraud" and A.R.S. § 44-1522 sets forth unlawful practices. The Court will, therefore, consider A.R.S. § 44-1522.

### iv. Criminal Fraud

Murar contends he disclosed instances of criminal fraud that violate A.R.S. § 13-2310. (Doc. 61 at 12.) It is illegal for "[a]ny person who, pursuant to a scheme or artifice to defraud, knowingly obtains any benefit by means of false or fraudulent pretenses, representations, promises or material omissions." A.R.S. § 13-2310(A). This statute is interpreted broadly to include dishonesty in the general and business life of members of society. *State v. Griffin*, 250 Ariz. 651 (App. 2021). Scheme or artifice to defraud is some plan, device, or trick to perpetuate fraud. *State v. Henry*, 205 Ariz. 229, 232 (App. 2003), *as corrected* (June 11, 2003). A benefit is "anything of value or advantage, present or prospective." A.R.S. § 13-105(3).

Murar argues he disclosed criminal fraud when he informed Brown that a customer had complained that an employee forged her signature on a finance agreement. (Doc. 61 at 12.) According to the customer, the employee falsified her signature on a contract to change the name of the bank financing her loan. (Doc. 61–6 at 19.) Murar does not, however, allege or offer any evidence that he believed this action benefited the employee or Defendants. Thus, Murar has failed to create a genuine issue of material fact as to whether he had a reasonable belief that Defendants violated A.R.S. § 13-2310 when he reported that the employee falsified a customers' signature.

But Murar also informed Brown that an employee had made "fake" and "fraudulent" repair orders, whereby customers would pay for repairs that were not performed. (*Id.* at 3.) These allegations include some evidence of misrepresentation and benefit. Accordingly, a reasonable jury could find Murar engaged in protected activity by reporting the alleged fake repair orders.

### v. Conclusion – Protected Activity

Murar has offered evidence that he had information or a reasonable belief that Defendants waived sales taxes using a falsified bill of lading in violation of A.R.S. §§ 42-1125, 42-1127, forged a customer's signature in violation of A.R.S. § 13-2002, and made false repair orders in violation of A.R.S. §§ 13-2002, 13-2310, and 45-1251. Murar also

offered evidence that he disclosed these alleged violations to Brown, the Arizona market president of AWR. The Court, therefore, finds that Murar offered enough evidence from which a reasonably jury could find he engaged in protected activity.

### b. Termination

"Termination of the employment relationship is required for a wrongful termination claim under the AEPA." *McNicol v. DMB Sports Clubs LP*, No. CV-19-00750-PHX-MTL, 2020 WL 1323143, at *6 (D. Ariz. Mar. 20, 2020). The parties do not dispute that Murar was terminated on October 25, 2018. (Doc. 58–4 at 36.) Accordingly, Murar has met the second prong of the prima facie test.

### c. Causal Link

Under the AEPA, an employee must show that there is a causal link between the employee's protected activity and the termination. *Whitmire*, 359 F. Supp. 3d at 796. To establish a causal link, the employee must show that the employer's retaliatory motive played a part in the employment action. *Id.*; *Alcozar-Murphy v. ASARCO Arizona Inc.*, No. CV-14-2390-TUC-DCB, 2017 WL 748626, at *7 (D. Ariz. Feb. 27, 2017), *aff'd sub nom. Alcozar-Murphy v. Asarco LLC*, 744 F. App'x 411 (9th Cir. 2018). This further requires a showing that the employer was aware of the protected activity. *Whitmire*, 359 F. Supp. 3d at 799. A causal link "can be inferred from timing alone where an adverse employment action follows on the heels of protected activity." *Id.* (quoting *Villiarmo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2000)).

It is undisputed that Defendants were aware of Murar's reports of alleged violations of law. (Doc. 61 at 12.) On September 3, 2018, Murar sent an email to Brown informing him an employee had created fake and "fraudulent" repair orders. (Doc. 61–6 at 3.) Murar informed Brown that an employee had allegedly forged a customer's signature on September 19, 2018. (*Id.* at 18–19.) Finally, Murar told Brown that an employee waived a customer's taxes using a falsified bill of lading on October 24, 2018. (Doc. 58 at 7.) Murar was terminated a day later, on October 25, 2018. (Doc. 58–4 at 36.) The September 3 and September 19, 2018 emails and the October 24, 2018 discussion between Murar and Brown

are sufficiently close in time to Murar's termination to support an inference of a causal link.

### d. Conclusion – Prima Facie Case

Murar has offered enough evidence from which a reasonable jury could find he engaged in protected activity, that he was terminated, and that a causal link exists between his protected activity and termination. Accordingly, Murar has satisfied his initial summary judgment burden of establishing a prima facie case of retaliation under the AEPA.

### 2. Legitimate, Nonretaliatory Reason for Termination

If an employee establishes a prima facie case of retaliation, the burden shifts to the employer to offer a legitimate, nonretaliatory reason for the termination. *Whitmire*, 359 F. Supp. 3d at 799; *Baron*, 2020 WL 5638539, at *2. "The employer need not persuade the court that it was actually motivated by the proffered reasons: 'it is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff.'" *See Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987).

Defendants contend they terminated Murar for his poor performance. (Docs. 58 at 12; 62 at 4.) There is no dispute that Murar's and the dealership's performance were doing well from February to June 2018. (Docs. 58 at 12; 58–2 at 118–121.) But the dealership's performance started to decline in June 2018. (Docs. 61 at 14; 62 at 5; 58–2 at 119–121.) Brown and Murar discussed the dealership's declining performance that same month. (Doc. 58–2 at 215–16.) On September 27, 2018, Brown and the Regional Vice President of Human Resources met with Murar to discuss the dealership's performance issues. (*Id.* at 121.) Brown sent Murar an email the following day explaining that they needed to take immediate steps to improve AFS's performance. (Doc. 58–4 at 22.) Brown further explained that the fourth quarter was critical for Murar to remain at the dealership. (*Id.*) Brown specifically set forth 12 targets and explained that Murar needed to meet a majority of them on a monthly basis to retain his position. (*Id.*) Defendants contend the dealership's performance was doing worse on 7 of the 12 targets and that it ultimately failed to meet 11 of the targets for October 2018. (Doc. 58 at 13.) Murar was terminated on October 25,

2018. (Doc. 58–4 at 36.) The corrective action record explained that Murar had been counseled regarding the dealership's performance and that the dealership was not achieving a majority of the targets and lacked significant improvement. (*Id.*) Accordingly, Defendants have offered enough evidence to meet their burden of articulating a nonretaliatory reason for terminating Murar.[5]

### 3. Pretext

If the employer articulates a nonretaliatory reason for the termination, the employee has the burden of showing the employer's proffered reasons are a mere pretext for retaliation. *Whitmire*, 359 F. Supp. 3d at 799. In other words, the plaintiff must create a genuine issue of material fact as to pretext to avoid summary judgment. *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 890 (9th Cir. 1994), *as amended on denial of reh'g* (July 14, 1994). The employee can do so by showing: (1) the employer's proffered reasons are unworthy of credence; or (2) retaliation was more likely the employer's motivation. *Vasquez v. Cnty. of Los Angeles*, 349 F.3d 634, 641 (9th Cir. 2003), *as amended* (Jan. 2, 2004). Although relevant, the minimal circumstantial evidence necessary to make out a prima facie case will not suffice to show pretext. *Wallis*, 26 F.3d at 892. Instead, the

---

[5] Defendants rely on *Gerberry v. Maricopa Cty.*, 172 F. App'x 781 (9th Cir. 2006) for the proposition that the "mixed-motive" test applies to retaliation claims under the AEPA. (Docs. 58 at 11–12; 62 at 3–4.) Under this test, if the plaintiff shows his or her protected conduct was a motivating factor for the employment decision, the employer can, nevertheless, avoid liability if it can "show by a preponderance of the evidence that it would have reached the same decision . . . even in the absence of the protected conduct." *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). The Court first notes that *Gerberry* is an unpublished disposition, which is not precedential and cannot be cited to this Court in accordance with Ninth Circuit Rules. *See* U.S. Ct. of App. 9th Cir. R. 36-3(c) ("Unpublished dispositions and orders of this Court issued before January 1, 2007 may not be cited to the courts of this circuit."). Furthermore, the cases *Gerberry* cites in support of this conclusion do not clearly hold that Arizona has adopted the mixed-motive test for retaliation claims under the AEPA. *See Thompson v. Better-Bilt Aluminum Prod. Co.*, 187 Ariz. 121 (App. 1996), *as corrected* (Apr. 8, 1996) (decided before the AEPA went into effect); *Chaboya v. Am. Nat. Red Cross*, 72 F. Supp. 2d 1081, 1092 (D. Ariz. 1999) (holding the AEPA did not apply because it went to effect after plaintiff had filed the suit). Although the *McDonnell Douglas* and mixed-motive frameworks can coexist without conflict, *Costa v. Desert Palace, Inc.*, 299 F.3d 838, 854 (9th Cir. 2002), *aff'd*, 539 U.S. 90 (2003), the Court is not aware of any Arizona case applying the mixed-motive test to retaliation claims under the AEPA. The Court will, therefore, proceed under the *McDonnell Douglas* burden-shifting framework which requires the employee to show the employer's nonretaliatory reasons for termination are pretext. *Baron*, 2020 WL 5638539, at *2.

plaintiff must produce specific and substantial evidence of pretext. *Id.* at 890.

Murar first argues Defendant's reason is pretextual because they did not provide him with an improvement plan in July or August when the dealership's performance began to decline and only did so after he raised his concerns of illegal activities. (Doc. 61 ta 14.) But Murar admitted that he and Brown discussed the dealership's declining performance as early as June 2018. (Doc. 58–2 at 215–16.) Murar also admitted that, after such discussion, AFS continued to underperform in the third quarter of 2018. (Doc. 61 at 6.)

Murar also argues that the timing between his reports and his termination is evidence of pretext. (*Id.* ta 14.) Temporal proximity, alone, is not sufficient to show pretext where "the evidence shows there was a legitimate reason for the adverse employment action." *Smith v. WM Corp. Servs. Inc.*, No. CV-19-01579-PHX-SPL, 2021 WL 2352425, at *7 (D. Ariz. June 9, 2021) (citing *Curley v. City of N. Las Vegas*, 772 F.3d 629, 634 (9th Cir. 2014)).[6] In such cases, the employee must offer evidence beyond temporal proximity that refutes the employer's proffered legitimate reasons for termination. *See Hashimoto v. Dalton*, 118 F.3d 671, 680 (9th Cir. 1997) ("Although the timing of these events suffices to establish a minimal prima facie case of retaliation, it does nothing to refute the [employer's] proffered legitimate reasons for disciplining [the employee]."); *see also Glass v. Asic N., Inc.*, 848 F. App'x 255, 258 (9th Cir. 2021) (holding temporal proximity, alone, did not establish pretext because it did not directly rebut the employer's non-discriminatory reason for termination). Here, it is undisputed that dealership's performance started to decline sometime in June 2018. (Docs. 61 at 14; 62 at 5; 58–2 at 119–121.) AFS continued to underperform in the third quarter of 2018. (Doc. 61 at 6.) The dealership's performance was doing worse on 7 of the targets and it ultimately failed to meet 11 of 12 the targets for October 2018. (Doc. 58 at 13.) Because there is evidence of a legitimate nonretaliatory reason for the termination, Murar cannot rely on temporal proximity, alone, to show

---

[6] *See also Schuler v. Banner Health*, No. CV-15-01565-PHX-ROS, 2018 WL 3620000, at *9 (D. Ariz. July 30, 2018), *aff'd,* 778 F. App'x 473 (9th Cir. 2019) (holding that although temporal proximity may have been enough to satisfy the employee's prima facie case of retaliation, it was not enough to show the employer's reason for termination – poor job performance – was pretextual, where such reason was undisputed and supported by the evidence).

Defendant's reason of terminating Murar was pretextual.

Finally, Murar argues that the September 28, 2018 email Brown sent him states that the fourth quarter is critical and that he was terminated before the end of the quarter. (Doc. 61 ta 14.) The same email also expressly stated that Murar needed to meet a majority of the targets on a monthly basis to retain his position. (*Id.*) Murar, nevertheless, argues he was terminated even before the end of October. (*Id.* at 14–15.) He specifically contends that if Defendants truly wanted to evaluate him on a monthly basis, then it was reasonable to expect them to at least wait until the month was over before terminating him. (*Id.* at 15.) It is undisputed, however, that the dealership's performance was regressing on seven of the targets and that it ultimately failed to meet 11 of the 12 targets for October 2018. (Doc. 58 at 13.) Murar also admitted that he does not know if he met or was on track to meet any of the October targets. (*Id.* at 121.) Thus, Murar has not produced specific and substantial evidence that Defendant's proffered reason for his termination – the dealership's poor performance – was pretextual. Because Murar has not created a genuine issue of material fact as to pretext, Defendants are entitled to judgment as a matter of law on his claim for retaliation under the AEPA.

### C. Piercing the Corporate Veil

Murar sued both AutoNation and AFS alleging that they act and operate as a single entity.[7] (Doc. 1–2 at 3.) A parent corporation is generally not liable for the actions of its subsidiary. *Keg Rests. Arizona, Inc. v. Jones*, 240 Ariz. 64, 71 (App. 2016). But under the "alter ego" theory a parent corporation may be held liable for the acts of its subsidiary if the plaintiff can show "(1) unity of control and (2) that observance of the corporate form would sanction a fraud or promote injustice." *Gatecliff v. Great Republic Life Ins. Co.*, 170 Ariz. 34, 37 (1991); *see also Keg Rests.*, 240 Ariz. at 73. The Arizona Supreme Court has

---

[7] AutoNation initially argued it is not an integrated enterprise with AFS. (Doc. 58 at 7.) The Ninth Circuit applies the "integrated enterprise" test to determine whether two or more entities jointly have the number of employees required to satisfy the statutory definition of an employer under Title VII of the Civil Rights Act of 1964 ("Title VII"). *Anderson v. Pac. Mar. Ass'n*, 336 F.3d 924, 928 (9th Cir. 2003). Murar did not bring a claim under Title VII. Furthermore, unlike Title VII, the AEPA applies to all employers, regardless of number of employees. *Taylor v. Graham Cnty. Chamber of Com.*, 201 Ariz. 184, 187 (App. 2001). Thus, the "integrated enterprise" test is inapplicable to this case.

recently clarified that the alter ego theory "is not itself a cause of action but is raised in the context of another cause of action such as ones based on contract or tort." *Specialty Companies Grp., LLC v. Meritage Homes of Arizona, Inc.*, No. CV-20-0086-PR, 2021 WL 3416979, at *2 (Ariz. Aug. 5, 2021). Thus, because the Court grants summary judgment in favor of Defendants on all of Murar's claims, it need not address whether there is an issue of material fact as to the alter ego theory of liability.

## IV.   CONCLUSION

Accordingly,

**IT IS ORDERED** granting Defendant's Motion for Summary Judgment (Doc. 58).

**IT IS FINALLY ORDERED** that the Clerk of Court shall enter judgment for Defendants and close this case.

Dated this 1st day of September, 2021.

*Michael T. Liburdi*
Michael T. Liburdi
United States District Judge